ROCKY MOUNTAIN STUD FARM CO. v. LUNT et al.

No. 2612.   Decided June 24, 1915 (151 Pac. 521).

1. JOINT-STOCK COMPANIES—PARTNERSHIP—TENANCY IN COMMON—
   WHAT CONSTITUTES.  Where a number of individuals purchased
   a horse, each owning a share in the animal proportioned to the
   amount he paid, the owners did not constitute a partnership or
   a joint-stock company, but were merely tenants in common.
   (Page 310.)

2. TENANCY IN COMMON—RIGHTS OF COTENANTS.  Where a number
   united in purchasing a horse, but did not form a partnership or a
   joint-stock company, each owner could sell his interest, regard-
   less of the others, although he could exercise no control over
   the interests of his fellows; and hence, where some of the
   purchasers of the horse agreed to exchange it for another and
   to pay boot money, the seller of the second horse, who re-
   ceived their interests and the boot money, had no right of
   action, though some of the first owners would not agree to
   the transaction.  (Page 310.)

3. TENANCY IN COMMON—AGENCY.  The mere fact that a number
   united in purchasing a horse does not render them agents for
   each other in disposing of the animal.  (Page 310.)

4. PARTNERSHIP — POWERS OF PARTNERS — TENANTS IN COMMON
   Every partner has full and complete authority to bind all
   other partners by his acts or conduct in relation to the busi-
   ness of the firm, and to the same extent as if he held full power
   of attorney from all members.  (Page 310.)

5. TENANCY IN COMMON—RIGHTS OF COTENANTS.  Where insever-
   able personal property is held by several persons as joint ten-
   ants, the tenant in actual possession may retain it as against
   his cotenants.  (Page 310.)

6. EXCHANGE OF PROPERTY—PERSONAL PROPERTY—CONTRACT.  Where
   plaintiff in making a trade of horses, dealt with the several own-
   ers as individuals, they cannot escape liability for boot money
   on the ground that his first proposal was that, if all the par-
   ties interest in the horse would not agree to the sale, it should
   not be consummated.  (Page 313.)

7. PARTNERSHIP—LIABILITY OF PARTNERS.  Some of the owners
   of a horse entered into an agreement with plaintiff to exchange
   that animal for another on payment of certain boot money.
   Some of the owners refused to participate in the agreement,
   and plaintiff settled with some of those who did.  *Held* that,

though the nonassenting owners be considered partners, they were not liable, for, where the liability has clearly attached, subsequent transactions between third persons and one of the partners may work an extinguishment. (Page 313.)

8. JOINT-STOCK COMPANIES—WHAT ARE. A joint-stock company is generally classified as a partnership, possessing some of the characteristics of a corporation; its members being liable ordinarily as partners. (Page 315.)

9. JOINT-STOCK COMPANIES—ACTIONS AGAINST — INSTRUCTIONS — SUBMISSION OF ISSUES. Where defendants in their answer characterized themselves as a joint-stock company, and there was evidence that some of the defendants effected individual settlement of the claim, the court should submit to the jury whether the settlement was intended as an accord and satisfaction of the claim—discharged the obligation—as to such defendants. (Page 315.)

10. RELEASE—JOINT DEBTORS—EFFECT. Ordinarily the discharge of one joint debtor discharges his codebtor. (Page 315.)

Appeal from District Court, Second District; *Hon. N. J. Harris,* Judge.

Action by the Rocky Mountain Stud Farm Company, a corporation, against H. H. Lunt and others.

Judgment for plaintiff against some of defendants, and for some of the defendants against plaintiff. All parties appeal.

REVERSED and remanded, with directions.

*E. H. Ryan* and *H. H. Henderson* for plaintiff.

*Joseph Chez* for defendants.

### STATEMENT OF FACTS.

This is an appeal from a judgment rendered in the District Court of Weber County. The action was brought to recover the sum of $2,026.69, a balance alleged to be due on the purchase price of a Clydesdale stallion known as Sir Charles Lynn. The facts are about as follows:

On or about May 10, 1910, the defendants and six other parties, all residents of Cedar City, this state, jointly purchased

for breeding purposes a stallion known as Buffet. The purchase price of the animal was $2,600, which was. divided into fifty-two shares of the par value of $50 each. These parties, twenty-eight in number, were engaged in various occupations common in the rural and farming district of this state, such as agriculture, raising cattle and sheep, and, in a limited way, raising horses. It seems that their purpose in purchasing the horse Buffet was to improve their stock of domestic horses. This was the only profit contemplated or realized from the investment. For convenience they called themselves the French Coach Horse Company, hereinafter referred to as the company. No writings were signed by the parties, nor did they have any by-laws in writing regulating the management of the affairs of the company. The members orally agreed that for each share or interest a member had in the horse he was entitled to breed one mare—that is, members owning one share only, fifty dollars in the stallion, were each entitled to breed one mare; members owning $100 two, and those owning $200 were entitled to breed four mares. The company kept a book called a "stock book" in which were entered the names of the members and the number of shares that each owned in the horse. It also appears from the evidence, what there is on the point, that each member of the company was assessed five per cent. on his investment to pay the cost of keeping and caring for the horse. These matters may appear on the first impression to be unimportant, or, at most, only incidental to the question involved. They nevertheless throw considerable light on the transactions hereinafter referred to and out of which this controversy arose. On July 3, 1910, E. W. Patrick, who was and is the president of plaintiff corporation, and who seems to be its business manager, came to Cedar City, bringing with him the Clydesdale stallion hereinbefore mentioned. On his arrival Patrick immediately commenced negotiating with members of the company with the view of selling to the company the Clydesdale stallion. He offered to sell the horse for $3,400 and to accept the horse Buffet in payment of $1,900 on the purchase price. A meeting at which Patrick was present was held by certain members of the com-

pany to consider the proposition. The offer was rejected by practically all the members who were present at the meeting. A few days thereafter two members of the company, P. B. Fife and J. H. Hunter, decided to make Patrick a tentative offer of $800 cash and the horse Buffet for the Clydesdale stallion, and Fife telephoned Patrick, who, in the meantime, had left Cedar City, submitting to him the proposition.

Fife was called as a witness by the plaintiff, and testified in part as follows:

"I 'phoned Mr. Patrick, who was at Kanarra, and we talked * * * for a while; and he says, 'I will take *$1,250 to boot between the coach horse* (Buffet) *and Sir Charles Lynn.* If you will look around and see if you can get eighteen men to sign up, I will come back and consider it.' "

Continuing, the witness said:

"I talked with some of the members of the Coach Horse Company to ascertain their frame of mind. I interviewed some 16 or 18 of them. I told the members I met of the proposition."

For this service Patrick paid Fife forty-eight dollars. Patrick does not deny that he authorized Fife to represent to members of the company that he (Patrick) had offered to trade horses with them provided they would pay $1,250 "to boot." In pursuance of the negotiations carried on by Fife and the representations made by him on behalf of Patrick to members of the company, Patrick returned to Cedar City about July 10, 1910. Immediately on his return, he commenced negotiating with members of the company for the sale, as he claims, of the Clydesdale horse. It seems that he called at the residence or place of business of each member of the company and submitted to him a proposition which he had reduced to writing. In this way he procured the signatures of twenty-three members of the company to the instrument. Six members refused to sign the contract or to have anything to do with the transaction. The contract is as follows:

"It is hereby agreed this .... day of July and August, 1910, by and between the Rocky Mountain Stud Farm Com-

pany of Ogden, Utah, and the undersigned, residents of the
County of Iron, State of Utah, whereby the undersigned have
purchased from the Rocky Mountain Stud Farm Company
one registered Clydesdale stallion, known as Sir Charles Lynn,
for and in consideration of the sum of thirty-four hundred
dollars ($3,400), and upon the following conditions:

"First. The Rocky Mountain Stud Farm Company guar-
antees said Sir Charles Lynn to be a 60 per cent. foal getter
for the season of 1911, if bred to good producing mares and
properly handled and cared for by the purchasers; but, should
the said Sir Charles Lynn not prove to be a 60 per cent. foal
getter under the above conditions, then the said purchasers
agree either to relieve the Rocky Mountain Stud Farm Com-
pany from all liabilities and damages occurring on account of
said Sir Charles Lynn not proving to be a 60 per cent. foal
getter, or else return said Sir Charles Lynn to the barn of the
seller in as sound condition as he now is, and there receive
another horse of equal value that is supposed to be a sure foal
getter, in full settlement of all damages occurring on said
account.

"Second. The purchasers agree to furnish the Rocky
Mountain Stud Farm Company with a monthly report in
writing, stating the number of mares tried, bred and re-
served, as well as the conditions of the horse.

"Third. The Rocky Mountain Stud Farm Company agrees,
in case the said Sir Charles Lynn should die from natural
causes within a period of three years from the date of this
contract, to sell to the undersigned purchaser another horse of
equal value to said Sir Charles Lynn for the sum of seven-
teen hundred dollars ($1,700).

"Fourth. Each and all of the undersigned purchasers
agree that the purchase price, thirty-four hundred dollars
($3,400), shall be paid to the order of the Rocky Mountain
Stud Farm Company at Ogden, and among themselves agree
that they shall pay proportionately the amount set opposite
their names.

"Fifth. It is further agreed that payments shall be made
in cash, or at the option of the purchasers they may execute

the following payments, viz.: Twelve hundred and fifty dollars cash upon tender of delivery of said Sir Charles Lynn by the seller and the delivery by the purchasers of a certain nine year old Coach imported stallion Bufford (Buffet).

"Sixth. There are no other conditions pertaining to this contract and no salesman or agent has power to change or modify. Time is of the essence of this contract.

"This contract is executed in duplicate, each party holding a copy. (Signed) H. H. Lunt. Peter B. Fife. Samuel Bauer. Samuel W. Leigh. K. L. Jones. Thomas Dix. Jno. E. Dover. David Bulloch. Daniel Stephens. William Macfarlane. A. Webb. Charles Mosdell. Henry Leigh. J. H. Hunter. J. H. Arthur. Andrew Corry. Arthur Jones. Herbert W. Webster. James Bulloch. Jno. T. Bulloch. Jno. Bauer. Chauncey Macfarlane. Francis Webster, Jr."

Twelve of the twenty-three men who signed the foregoing document were witnesses and testified at the trial. Each of them, except Fife, testified that when Patrick presented the writing he at first refused to sign it, and that Patrick represented to him that he was the only member of the company who was opposed to the trade; that the other members were all in favor of the deal; that unless he (Patrick) succeeded in procuring the signature of every man owning the interest in the horse Buffet to the document the trade would be abandoned, and the parties signing the instrument would not be bound thereby; and that he signed it with this express understanding. Patrick, however, testified that he made no such representations and that there was no such understanding. The evidence, without conflict, shows that during the time he was procuring signatures to the contract he represented to members of the company that he intended, if the deal should go through, to remove the horse Buffet from Cedar City and take him into the northern part of the state. To do this it was necessary for him to purchase the interest each member of the company had in the horse. So long as any member of the company retained an interest in the horse, Patrick could not legally take it out of the country, or otherwise dispose of the animal to the prejudice of his co-owners. Again recurring to the alleged representations made by Pat-

rick to the members of the company to induce them to sign the contract, Fife, who, as stated, was plaintiff's witness, testified on cross-examination in part as follows:

"Q. Do you remember the paper being handed to you and you refusing to sign it? A. Yes, sir. I told him when I looked at the paper that I did not want to sign this; that it was a contract. We ain't offered to buy the horse at all—wouldn't have the horse if we have to pay for him out and out. Q. In other words, it was to be a trade, and not a sale? A. That was definitely understood between him and me, that I would not sign under them conditions (referring to certain provisions of the contract). It was to be a trade. We were to pay $1,250 and the coach horse for Sir Charles Lynn. The sale was never talked of between him and me."

W. E. Corry, one of the members of the company who refused to sign the document, testified, and his testimony is not disputed, that Patrick asked him if he was willing to "trade," and that he answered, "No, sir"; that Patrick said that he—"would guarantee me dollar for dollar in the Clyde horse for what I had in the coach. At another time he asked me to sign the paper to show that I was willing if all the others were willing. Finally, when he told me that I was the only man blocking the deal for 27 or 28 of my fellow townsmen, I told him he could count on me. He says, 'Sign the paper.' * * * I refused to sign the contract, and told him that unless he brought me a contract strictly setting forth the provisions of the trade I would not sign it. * * * I says, 'If I sign * * * what have I got from you that you ain't going to enforce the provisions of your * * * agreement?' He says, 'You have got my word.' I says, * * * 'I believe that if you cannot rib through that trade, that you have ribbed up there, that you are going to force the men that have signed that contract to pay you $3,400 for the Clydesdale horse.' He says, 'You don't believe it.' I says, 'I do believe it.' I never signed the agreement."

On cross-examination the witness said, referring to the members of the company:

"Knowing these men as I do, I don't think they would sign

a contract, if it had been explained to them, * \* * to buy that horse for $3,400.''

The foregoing fairly illustrates the testimony of the defendants respecting the alleged representations made by Patrick to induce them to sign the agreement, as well as the conditions under which they signed it. When it became known that Patrick was unable to procure the signatures of all the members of the company to the agreement, those who had signed it, with the possible exception of one or two, refused to close the deal by transferring their interest in the horse Buffet to Patrick and paying him $1,250 cash ''to boot,'' the agreed difference in the value of the two horses. Patrick, on being advised that certain members of the company were dissatisfied and had announced that they would neither transfer their interest in the horse Buffet to him nor pay the $1,200 cash, or any part thereof, stipulated in the agreement, ''called a meeting'' and hired a boy to notify the parties who had signed the agreement that he would meet with them in the ''town hall,'' presumably to consider their grievances. This meeting was held about August 15, 1910. Nothing was accomplished at this meeting by way of settlement between Patrick and the signers of the agreement. Patrick in the meantime had delivered Sir Charles Lynn to one of the members of the company, D. C. Bulloch, who had signed the agreement. Immediately after the meeting last referred to Patrick made a demand on each person who had signed the agreement to transfer his interest in Buffet to plaintiff and to pay his *pro rata* of the $1,250 mentioned in the agreement, which amounted to twenty-four dollars for each share or interest (fifty dollars) he owned in the horse. This the parties at first refused to do, claiming that since Patrick had failed to procure the signatures of all the members of the company to the agreement, as he had promised to do, they were not required to complete the deal on their part.

Each of the defendants present at the trial testified that Patrick threatened that unless his demand was complied with he would commence an action in the District Court of Weber County against all who had signed the agreement; that Patrick promised him that, if he would transfer to plaintiff

his interest in Buffet and pay his *pro rata* of the $1,250, he would be released from all obligations under the agreement, and with this understanding he transferred his interest in the horse and paid the amount of cash demanded of him. Patrick denied that he made any such promises. Each of the defendants who transferred his interest in Buffet and paid his *pro rata* of the $1250 received from Patrick a receipt showing the transfer of his interest in Buffet and payment of the money and that he had purchased an interest in Sir Charles Lynn. One of the defendants, A. Webb, gave his note for ninety dollars in settlement of the claims made against him by Patrick. While there is no direct evidence on the point, it seems, from the character of the questions propounded to Webb by plaintiff's counsel, that plaintiff negotiated the note and transferred it to one of the banks in Ogden City. This, however, is unimportant, except that it illustrates the unconscionableness on the part of the plaintiff in dragging this defendant into court hundreds of miles from his home on a claim which we have a right to infer from the statements made in open court, through its counsel, it had sold and transferred to third parties.

The record shows that Patrick succeeded in completing a sale, or, more correctly speaking, in exchanging interests in the Clydesdale horse, Sir Charles Lynn, for interests in the horse Buffet and a stipulated amount of cash with the following defendants: A. Webb, Daniel Stephens, Will Macfarlane, Peter B. Fife, Chauncey Macfarlane, Samuel W. Leigh, J. H. Hunter, J. H. Arthur, John T. Bulloch, David C. Bulloch, H. H. Lunt, Herbert W. Webster, John Bauer and K. L. Jones. It appears that several members of the company who signed the agreement failed to pay their *pro rata* of the $1,250. It seems, however, that their respective interests in Buffet were transferred on the stock book of the company to the plaintiff. The horse Buffet was not delivered to the plaintiff, but remained in the constructive, if not the actual, possession of the members of the company who were not parties to the deal under consideration.

On May 11, 1911, plaintiff commenced this action in the District Court of Weber County to recover the balance

($2,026.69 and interest) alleged to be due and owing on the agreement herein set forth, making all members of the company who had signed the instrument defendants. Sixteen of the defendants filed a joint answer, and, after denying the alleged indebtedness, alleged as an affirmative defense that they were induced to sign the instrument herein referred to as the "agreement" through fraudulent conduct and the false and fraudulent representations of Patrick herein referred to; and they also alleged that they had transferred their respective interests in Buffet and paid a stipulated amount in cash, demanded by Patrick, to plaintiff, with the express understanding that they and each of them would be released from all claims and demands made by plaintiff because of the execution of the agreement. In other words, the allegations of the answer in that regard were to the effect that they had "purchased their peace," and that they transferred their interests in Buffet and paid the amount of money demanded by Patrick as an "accord and satisfaction" of all demands made against them growing out of the transactions herein referred to. They also alleged that because of the fraudulent transactions of Patrick they have been deprived of the service of the horses mentioned for breeding purposes (notwithstanding members of the company have had the continued and undisturbed possession of both horses), to their damage in the sum of $440. In their prayer they demand judgment against plaintiff for—"the sum of $1,275, the value of the stock transferred by defendants to plaintiff, and $615.55, paid by defendants to plaintiff, and the sum of $440 damages for the loss of the services of both of said horses, amounting in all to the sum of $2,330.55 damages."

The other defendants also filed a joint answer, which contains substantially the same matter as the above. The only relief, however, asked for, is that plaintiff "take nothing, and that his complaint be dismissed," and that they recover costs. The cause was tried to a jury. When the evidence was all in, and both sides had rested, the court, on motion of counsel for plaintiff, withdrew the case from the consideration of the jury as to fourteen of the defendants, and made findings, conclusions of law, and rendered judgment against them in

favor of plaintiff for the sum of $2,028.69 and legal interest thereon amounting to $395.59, and $292 costs, making a total of $2,716.28. As to the remaining eight defendants, the cause was submitted to the jury, who returned a verdict in favor of "all the defendants" and against the plaintiff for the sum of $848.90 and interest, amounting to $167.06, making a total of $1,015.96. Judgment was duly entered on the verdict as rendered. The plaintiff and all of the defendants appeal.

McCARTY, J. (after stating the facts as above).

We know of no rule or principle of law applicable to the facs of this case upon which the judgments or either of them, can be upheld. The case was tried by plaintiff on the theory that the defendants and other parties owning an interest in the horse Buffet were co-partners and that the French Coach Horse Company was a partnership concern. The agreement on which the action is based was executed by the several defendants, each one acting for himself, and not in any sense acting for or representing any of the others, in the transaction; and the action was brought against them in their individual capacity, and not as a company. It is not alleged in the complaint, nor does the complaint contain any matter from which it may be inferred, that the defendants were co-partners, or that plaintiff so regarded them at the time of the execution of the agreement. The defendants framed their answers on the theory that they were a joint stock company, but tried the cause to the court and jury on the theory that they were neither a company nor a partnership. The court submitted the issues to the jury on the theory that the defendants were partners in the transactions mentioned. In its charge the court told the jury that:

"The company referred to in this action as the French Coach Horse Company must be considered only as a partnership, so far as the dealings of its members with third parties or the plaintiff herein are concerned."

The court, however, made findings of fact and rendered judgment thereon against 14 of the defendants in their individual capacity, and not as a company or as a partnership,

and judgment was also entered on the verdict returned by the jury in favor of "all the defendants" as individuals, and not as a partnership.

The French Coach Horse Company was not a partnership. Parsons on Partnership, Section 76. Neither was it a joint stock company. 23 Cyc. 467, 469; 17 A. & E. Ency. L. (2d Ed.) 636, 639. The defendants were co-tenants in the ownership of the horse. Freeman, Co-tenancy and Partition, Section 245. Each member of the company could, without obtaining the consent of or consulting the other members, sell or otherwise dispose of his interest in the horse; but he could not exercise any control or supervision over the interest owned by the other members unless authorized by them to do so. Neither could either of the parties owning an interest in the horse sell or incumber the animal—the joint property, without the authority or consent of all. 23 Cyc. 494. The contractual relation of the defendants in that regard differed from that existing between members of a partnership, because co-tenants are not. partners. Neither does the relationship of principal and agent exist between them, in the absence of an express or implied agreement to that effect. *Wright* v. *Kaynor*, 150 Mich. 7, 113 N. W. 779; 38 Cyc. 101. And in that regard a co-tenancy lacks some of the elements necessary to a creation of a joint stock company. 17 A. & E. Ency. L. (2d Ed.) 636, 637. The rule is elementary that in ordinary partnerships each partner is an agent for the firm, and has power to bind his co-partners by any act or transaction pertaining to the partnership dealings or that is within the scope of the business carried on by the firm. In Parsons on Partnership, Section 83, the author says that:

"Every partner has full and complete authority to bind all the partners by his acts or contracts, in relation to the business of the firm, in the same manner and to the same extent as if he held full powers of attorney from all the members."

See 30 Cyc. 477; Story on Partnership, Section 101.

A co-tenant, as stated, has no such power. He cannot sell or incumber the joint property without authority from his co-tenant. Nor can he, unless authorized so to do, exercise any

supervision over the interest of any other co-tenant. In 17 A. & E. Ency. L. (2d Ed.) 672, the distinction between a co-tenancy and a partnership is illustrated as follows:

"There is no relationship existing between cotenants, as between partners, which will render the acts of one cotenant respecting the common property binding on the others. No action of one or more of several tenants in common can impair the rights of the other cotenants. Either cotenant may charge his separate interest, or may convey or mortgage it, or become personally liable upon an undertaking respecting it."

And again:

"One tenant in common cannot bind his cotenant personally, nor by any unauthorized agreement or act, in respect to the common property."

In 7 R. C. L. 810, it is said:

"Partnership is distinguished from both species of cotenancy by the means and by the result of its creation. The means of its creation necessarily include an agreement between the parties; whereas, neither a joint tenancy nor a tenancy in common need rest upon any agreement. The ordinary incidents of the partnership relation, whereby each partner becomes the agent of the other, with authority to manage and dispose of the firm property, and to make all contracts within the scope of the business in which the firm was designed to engage, do not arise from a joint tenancy, nor from a tenancy in common. Partnership and tenancy in common also differ from each other in other important particulars. Each cotenant buys in, or sells out, or incumbers his interest at pleasure, regardless of the knowledge or consent or wishes of his co-owners, and without affecting the legal relation between them beyond the going out of one and the coming in of another. One cannot buy in or sell out of a partnership at pleasure, for such an act would of itself work a dissolution of the partnership, and necessitate its final settlement."

And again, on page 809:

"The partners have a joint interest in the assets of the partnership, and are required to sue and be sued jointly in reference thereto."

As pointed out in the foregoing statement of facts, Buffet was valued at $2,600, which amount was divided into fifty-two shares or interests, of the par value of fifty dollars each. These shares or interests were held by twenty-eight persons, each of whom was the owner of from one to four shares. As

stated, these people were co-tenants in the ownership of the horse. Therefore, to entitle plaintiff to the exclusive possession of the animal, it was necessary for it to purchase the interests held by each of the twenty-eight co-tenants. It is a well-recognized rule of law that, where inseverable personal property is held by several persons as joint tenants or tenants in common, the tenant in actual possession of the chattel may retain possession against his co-tenants. In 23 Cyc. 490, the rule is tersely, and, as we think, correctly stated as follows:

"Joint tenants' possession is in common, and each has a right to the enjoyment of the whole property to the extent of his interest. If only one of them is in the occupancy (possession) of the property, he must be considered as possessing, not only for himself, but also for the others and although it is competent for the joint tenants to make a subdivision of time for the exclusive occupancy (possession) of the whole of the joint property, one joint tenant cannot recover for exclusive possession of the premises (property) against his co-tenant."

See, also, Freeman on Co-tenancy and Partition, Section 245; 17 A. & E. Ency. L. (2d Ed.) 669, 670.

Patrick, for the purpose of disposing of Sir Charles Lynn, endeavored to deal with the members of the Horse Company collectively, but failed. He then sought to deal with the different members singly, and in their individual capacity, and succeeded in obtaining signatures of twenty-three of them to the agreement. Instead of relying on the terms of the agreement, and disposing of Sir Charles Lynn to the signers of the instrument collectively, and demanding of them the payment of the $1,250 as therein provided, he demanded of each defendant that he transfer his individual interest in Buffet to plaintiff and pay his *pro rata* of the $1,250. It appears that each of the twenty-three defendants transferred his interest in the horse to plaintiff and sixteen or seventeen of the defendants paid their *pro rata* of the $1,250. David C. Bulloch, one of the defendants, at the time he transferred his interest, gave Patrick an instrument in writing, of which the following is a copy:

"Cedar City, August, 1910.

"For a valuable consideration I hereby transfer, assign and

dispose of all my right, title and interest in the coach stallion known as Buffet, the same being free from all incumbrances and liabilities, and I defend E. W. Patrick as being the owner of the same in the sum of one hundred dollars.

"(Signed)   David C. Bulloch."

Bulloch received from Patrick an instrument in writing of which the following is a copy:

"$130.60.                          Cedar City, August 19, 1910.

"Received from David C. Bulloch payment in full for one hundred and thirty 60/100 dollars, stock in the Clydesdale stallion Sir Charles Lynn.        (Signed)

"The Rocky Mountain Stud Farm Co.,
"Per E. W. Patrick, Pres."

A similar receipt was given to each of the other defendants who transferred their interest in Buffet to plaintiff and made the cash payment demanded by Patrick.   These defendants thereby became co-tenants of plaintiff in the ownership of Sir Charles Lynn, and plaintiff became a co-tenant of the owners of Buffet who did not sign the agreement or otherwise dispose their interests in the horse.   In other words, plaintiff sold sixteen or more separate and distinct interests in Sir Charles Lynn and purchased an interest in Buffet.   The deal as to these defendants, therefore, became and was a completed transaction.

While plaintiff may have a separate cause of action against each of the defendants who signed the agreement, and who have made default in the payment of their portion of the $1,250, it cannot, under the facts as disclosed by the record, maintain an action against those who have paid.

Counsel for the defendants, in the discussion of the case in their printed brief, lay much stress on the claim that each defendant signed the agreement with the understanding or on the express condition that all the members of the Horse Company should sign it before it would become a valid contract, and since Patrick failed to obtain the signatures of all of the members it never became a completed contract.   Whatever defense the several defendants may have had to the enforcement of the agreement on that ground

in the first instance, they, by transferring their interests in Buffet to plaintiff with full knowledge that some of the members had not and would not join in the exchange of horses, will be deemed to have abandoned it, especially in view of the fact that Patrick, when he came to close the transaction, instead of relying on the terms of the agreement and dealing with them collectively, dealt with each individually; that is, the deal or trade he made with each defendant was a complete transaction in and of itself, separate and apart 'from, the transactions he had with the other defendants, and none of the defendants were required to pay any more for an interest in Sir Charles Lynn than he would have been required to pay if all the members of the company had signed the agreement. In other words, being in possession of the horse Sir Charles Lynn, they are in practically the same situation as they would be if all the members of the Horse Company had signed the agreement and each had paid his *pro rata* of the $1,250, except they have plaintiff for a co-tenant in the ownership of Sir Charles Lynn, instead of the six members of the company who retained their interest in Buffet. If all the members of the company had joined in the exchange of horses, they would have been jointly and severally liable to plaintiff under the agreement for the $1,250, and as between themselves each would have been required to pay twenty-four dollars in cash for each interest he owned in Buffet.

Defendants having procured, in some respects, a more favorable settlement than they would have been entitled to if all the members of the company had joined in the deal, we fail to see wherein they were prejudiced because of Patrick's failure to obtain the signatures of all the members to the agreement. None of the defendants were therefore entitled, under any rule or principle of law governing transactions of the character here involved, to a judgment against the plaintiff. Moreover, as we have stated, when the several defendants transferred their interests in Buffet to plaintiff, and paid their proportion of the $1,250 mentioned in the agreement, and were given an interest in Sir Charles Lynn, the deal as to each of them became a completed transaction. This would be so, even though the defendants were, as plaintiff

claims, and as the court at certain stages of the proceedings seemed to hold, partners in the transaction herein mentioned. In Story on Partnership, Section 155, the author says:

"When the liability has clearly attached, and become absolute and binding, subsequent transactions between such third persons and one of the partners may work an extinguishment of such liability, either *wholly or partially*. Thus, if a partnership were originally liable to a creditor for a debt, and he should afterwards accept a security of one partner, at all events if it should be a security of a higher or negotiable nature for the whole debt, as a satisfaction thereof, *wholly or in part*, it will operate as an extinguishment of the debt of the partnership. Upon like ground, if the creditor should receive the separate security of each partner for his own share of the debt in satisfaction thereof, all joint liability of the partnership for the debt would henceforth be gone." (Italics ours.)

In this case the evidence is all but conclusive that most of the defendants who paid their portion of the $1,250 mentioned in the agreement did so with the under- **8, 9, 10** standing and on the express condition that such payments should release them from all liability to plaintiff under the agreement. It is a well-recognized rule of law that, in ordinary partnership, a release by a creditor of one or more members from partnership liability operates as a release of all the members from such liability. 22 A. & E. Ency. L. (2d Ed.) 182; Parsons on Partnership, section 116.

A joint-stock company is generally classified as a partnership possessing some of the characteristics of a corporation. Parsons on Part., sections 431-434; Story on Part., section 164; 2 Page on Contracts 162; 17 A. & E. Ency. L. (2d Ed.) 637, 638; 23 Cyc. 467-469. In 2 Cook on Corporations, section 504, it is said:

"A joint-stock company lies midway between a corporation and a copartnership."

And again in section 508:

"A joint-stock company is, in regard to the liability of its members to creditors of the company, a partnership; its members are liable as partners; and the ordinary rules of partnership exist between the members themselves."

See 4 Words and Phrases, 2817. See, also, volume 2, Second Series, 1234-1236.

The distinction is, so far as this case is concerned, unimportant. It may be contended, however, that since defendants have characterized themselves in their answers as a joint-stock company they are not entitled to have the case considered and ruled on any other theory. Assuming, for the sake of argument, that defendants were, as the court charged the jury, partners in the transactions herein referred to, the court should have submitted to the jury the question of whether the payments made by the majority of the defendants of their portions of the $1,250 and the transfer of their respective interests in Buffet to plaintiff were intended as an accord and satisfaction of the claims,—discharge the obligation,—as to them.

"The general rule that the discharge of one joint debtor discharges his co-joint debtor is applicable to a discharge of one joint debtor by way of accord and satisfaction." 1 R. C. L. 201.

The court, instead of submitting this question to the jury, erroneously charged them that the defendants, in "making such payments, * * * affirmed and ratified such contract and would be liable to plaintiff thereunder," and further erroneously charged that if the jury believed that certain defendants "made payment to plaintiff on the contract in question, * * * and the plaintiff then promised said defendants * * * that if they would make such payments plaintiff would take such payments in full for the amounts due from them, and that relying upon such promise said defendants did make such payments, * * * such promise on the part of plaintiff was without consideration, and the plaintiff is not bound thereby." We invite attention to this phase of the controversy for the purpose of emphasizing what we have already said, namely, that there is no rule of law applicable to the facts upon which the judgments, or either of them, can be affirmed, or the action entertained, regardless of whether defendants were cotenants, a joint-stock company or a partnership.

The cause is reversed, with directions to the trial court to set aside and vacate the decision and judgments rendered, and to dismiss the action as to all the defendants, but without

prejudice as to any right of action plaintiff may have against the several defendants who have failed to pay their pro rata of the $1,250 "boot" money. Costs to the defendants.

STRAUP, C. J., and FRICK, J., concur.